UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JOHN CHUBB,                          )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )        Case No. 3:12-CV-168 JD
                                     )
CAROLYN W. COLVIN,                   )
ACTING COMMISSIONER                  )
OF SOCIAL SECURITY,[1]               )
                                     )
        Defendant.                   )


## MEMORANDUM OPINION & ORDER

John Chubb seeks judicial review under 42 U.S.C. § 405(g) of the Commissioner of

Social Security's final decision denying him disability benefits. The matter is now fully briefed

and ripe for adjudication: Chubb filed his opening brief on August 2, 2012 [DE 11] and the

Commissioner responded on September 11 [DE 12]. Chubb's reply was due on September 27,

but he has not filed any reply to date.  As explained below, the Court finds that the

Administrative Law Judge's decision—specifically the weight she gave to various medical

opinions—is not supported by substantial evidence. Therefore, the Court  remands this case to

the Commissioner for further consideration.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.  Pursuant to Rule 25
of the Federal Rules of Civil Procedure, Carolyn W. Colvin is automatically substituted as the Defendant in this suit.
No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social
Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

On March 9, 2010, claimant John Chubb filed concurrent applications for Social Security Disability Insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI")[2] alleging a disability onset date of November 4, 2008 (Tr. 182–93). He claimed he was disabled due to posttraumatic stress disorder, depression, and anxiety. After Chubb's initial applications and reconsideration were denied (Tr. 98, 114), he requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 18).

That hearing was held on August 2, 2011 (Tr. 18). Chubb appeared with a non-attorney representative and testified on his own behalf . *Id.* A Vocational Expert ("VE") provided testimony via the telephone (Tr. 82). On September 13, 2011, the ALJ found that Chubb was not disabled under the Social Security Act, concluding that he had the residual functional capacity ("RFC")[3] to perform jobs that exist in significant numbers in the national economy (Tr. 28). On February 7, 2012, when the Appeals Council denied Chubb's request for a review of the ALJ's decision, the ALJ's decision became the final decision of the Commissioner (Tr. 1).

## II. FACTUAL BACKGROUND

Chubb was 42 years old on the date of onset of his alleged disability (Tr.182). He has a high school education and some college (Tr. 47–48). His past work experience includes comptroller and accountant (Tr. 56–59, 84). He has not performed substantial gainful activity since his alleged onset date and was insured for disability benefits through at least December 31, 2013 (Tr. 20). For some time Chubb has been suffering from depression, anxiety and

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 401.1501 *et. seq.*, while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

[3] Residual Functional Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545(a)(1).

posttraumatic stress disorder ("PTSD"). While Chubb has also alleged some physical disabilities, he does not challenge the ALJ's determination that these conditions do not limit his work ability. The Court will confine its discussion to his mental health.

### A. Relevant Medical Evidence

1. *Kevin Kaufhold, M.D. – Primary Care Physician*

Dr. Kaufhold began treating Chubb in November 2009 (Tr. 358). On examination, Dr. Kaufhold noted that Chubb had a blunted affect and a depressed mood and diagnosed anxiety and hypertension (Tr. 359–60). He prescribed Lisinopril, Zoloft, and Alprazolam *Id.* In December 2009, Dr. Kaufhold diagnosed anxiety and depression, but noted on the physical exam that patient was not depressed (Tr. 356–57). He prescribed Trazodone and Xanax. *Id.*

Chubb returned in January 2010 with complaints of mood swings, anxiety, nervousness, hopelessness, and insomnia (Tr. 354). Dr. Kaufhold observed a depressed affect. *Id.* A mental status examination also revealed anhedonia (an inability to experience pleasure from enjoyable activities), anxiety, fearfulness, mood swings, and paranoia (Tr. 355). Dr. Kaufhold diagnosed anxiety and increased his dose of Trazodone. *Id.* In March 2010, Chubb stated he was "losing it" but also stated that he was almost employed (Tr. 378). He claimed to have frequent crying episodes and anxiety that was not well controlled on medications or therapy. *Id.* Dr. Kaufhold's examination revealed a depressed mood, agitation, anhedonia, as well as poor insight and judgment. *Id.* He diagnosed depressive disorder and anxiety and added Cymbalta to the other medications. *Id.* Later that month, Chubb reported relatively unchanged symptoms, and also reported that he is not getting anywhere with his job interviews (Tr. 376).

2. *Michael Reinstein, M.D.—Treating Psychiatrist*

In December 2008, Chubb was seen by Dr. Reinstein because he was "under stress" (Tr. R. 335). Although many of Dr. Reinstein's records are illegible, they reveal that he diagnosed Chubb with "bipoler disorder, most recent episode mixed, severe, without psychosis" (ICD-9 Code 296.63) and prescribed Zoloft (depression and PTSD) and Xanax (anxiety). *Id.* From then until May 2010, Chubb saw Dr. Reinstein approximately twice a month for consultations and treatment related to his depression, anxiety, and PTSD. Dr. Reinstein attempted to treat and control Chubb's mental ailments with a series of medications, with varying degrees of success. During this two-year period of treatment his affect and mood fluctuated from "bright" to "depressed" (Tr. 332–33).

3. *Dr. Desidero Pina and Nurse Janet Robinson – Madison Center, South Bend*

In May 2010, Chubb was seen at the Madison Center in South Bend (Tr. 340). He reported depression, anxiety, and PTSD stemming from a rape that occurred while he was in the Cook County Jail (Tr.343). Chubb reported symptoms of anhedonia, diminished self-esteem, insomnia, feelings of hopelessness, loss of motivation, difficulty concentrating, a depressed mood, thoughts of death, intrusive memories, nightmares, anxiety and avoidance of reminders of trauma, hypervigilence, exaggerated startle response, excessive worry, fatigue, and restlessness. *Id.* A mental status examination by Mark Snell, LCSW, revealed lethargic psychomotor activity, feelings of hopelessness or helplessness, tearfulness, anxiety, fearfulness, a sad/dysphoric/ depressed mood, a sad and tearful affect, and initial insomnia (Tr. 344). Snell also reported that Chubb exhibited normal productivity, memory and concentration. *Id.* He diagnosed Chubb with

"PTSD, major depressive disorder, recurrent, severe," and bereavement, and assessed a Global

Assessment of Functioning ("GAF")[4] score of 45 (Tr. 340).

Janet Robinson, a board certified clinical nurse specialist, and Desiderio Pina, M.D., a

board certified psychiatrist, completed a report regarding Chubb in September 2010 (Tr.

395–96). They noted that Chubb initially presented in May 2010 as very anxious and in extreme

distress related to being falsely imprisoned (Tr. 395). Chubb stated that while in prison he was

threatened, beaten, and raped numerous times. *Id.* As a result, he had PTSD, anxiety, and

depression. *Id.* In particular, the report noted that Chubb had lost 40 pounds and suffered from

decreased motivation, increased nightmares, increased worry, increased hypervigilence, and

OCD symptoms. *Id.*. His medications included Remeron, Trazodone, Cymbalta, Xanax, and

Klonopin. *Id.* According to the report, he was seen at the Madison Center every four weeks until

July 2010. He remained hypervigilant, had difficulty sleeping due to nightmares, suffered from

social anxiety, and as a result, had difficulty leaving his home for any long period of time. *Id.*

The report also noted that Chubb reported that his partner had recently died while in bed with

him, which traumatized him and increased his sense of anxiety and doom (Tr. 395–96). The

report concluded that his condition will likely exceed 12 months and estimated his recovery

chances as fair (Tr. 396).

Nurse Robinson also completed a Psychiatric/Psychological Impairment Questionnaire in

September 2010 (Tr. 397–406). She indicated major depressive disorder, recurrent, severe

without psychosis, PTSD, and anxiety, with a GAF score of 40 (Tr. 398). Clinical findings

included poor memory, sleep disturbance, personality change, mood disturbance, emotional

liability, recurrent panic attacks, anhedonia or pervasive loss of interests, paranoia or

---

[4]A Global Assessment of Functioning provides a "reporting of overall functioning . . . [and is considered]
particularly useful in tracking the clinical progress of individuals in global terms." AM. PSYCHIATRIC ASS'N,
DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., text rev. 2000).

inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, and hostility and irritability (Tr. 400). Chubb's primary symptoms were depression, hypervigilence, nightmares, crying episodes, withdrawal, panic attacks, and agoraphobia (Tr. 401).

Nurse Robinson opined that Chubb was markedly limited in his ability to perform all daily mental activities requiring understanding and memory, sustained concentration and persistence, social interactions, and adaptation (Tr. 402–04). In addition, she noted that Chubb had episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from that situation or experience an exacerbation of signs and symptoms as evidenced by a history of breakdowns in work settings that caused him to be unable to function (Tr. 404). He was incapable of handling even low stress work due to his PTSD symptoms, agoraphobia, social anxiety, mood swings, and depression.(Tr. 405). Robinson noted that Chubb's impairments are likely to produce good days and bad days, *id.*, and opined that he would be absent from work, on the average, more than three times a month as a result of his impairments or treatment (Tr. 406). She did not believe that Chubb was a malingerer and expected his conditions to last at least 12 months (Tr. 405).

Nurse Robinson and Dr. Pina completed a report at the request of the Social Security Administration in November 2010, which had sought clarification regarding their reports (Tr. 439–40). The treating psychiatric sources stated that Chubb was markedly limited in remembering locations and work-like procedures because of his frequent flashbacks when in social and work situations (Tr. 439). He had marked limitations in understanding, remembering, and carrying out one to two step instructions because of overwhelming anxiety and was

markedly limited in maintaining attention and concentration for extended periods due to severe PTSD that limited his capacity to concentrate and keep focused. He was also markedly limited in sustaining an ordinary routine without supervision because of severe social anxiety that prevented completion of tasks. *Id.* Further, he had marked limitations working in coordination with or proximity to others due to an intense fear of people. *Id.* Chubb had marked restrictions in making simple work-related decisions because of his anxiety, fear of social situations, and an inability to make decisions (Tr. 440). He is only able to leave his home for short periods of time, which would result in marked limitations completing a workweek without interruptions from symptoms and performing at a consistent pace. *Id.* He was markedly limited in his ability to accept instructions and respond appropriately to criticism from supervisors due to his fragility. *Id.* Chubb is able to adhere to basic hygiene and can have minimum contact with people, but had marked limitations in adapting to change in the work setting due to his PTSD symptoms. *Id.*.

According to Nurse Robinson and Dr. Pina, Chubb's medications were effective, but he still might require further adjustment to his medications, as well as ongoing therapy and hospitalizations (Tr. 440). Chubb was found to be disabled due to his psychiatric conditions primarily due to trauma associated with being raped while in jail for charges against him that were dropped and because of his fragility. *Id.* The report noted that, at this time, Chubb was unable to perform basic work related activities in a small group setting or alone because of his unstable mental condition. *Id.*

4.     *John Haskin, M.D. – Treating Psychiatrist, Oaklawn Psychiatric Center*

John Haskin, M.D., evaluated Chubb at the Oaklawn Psychiatric Center on October 14, 2010 (Tr. 453). Chubb complained of fatigue, anxiety, and intrusive day and night memories of his treatment in jail. *Id.* A mental status examination revealed that he was very anxious, tearful,

had an increased startle response, and was somewhat repetitive and overtly disturbed. *Id.* Dr. Haskin diagnosed PTSD and major depressive disorder, recurrent, severe without psychotic features, with a GAF score of 40 (Tr. 455). Dr. Haskin increased his dose of Xanax, continued Clonazepam, and started Cymbalta. *Id.*

In December 2010, Dr. Haskin's two mental status examinations revealed that Chubb was very anxious, fairly depressed, but with good insight and judgment (Tr. 450). At the first appointment, Dr. Haskin assessed a GAF score of 43 (Tr. 451, 516). In late December, Chubb reported that he is "doing fairly well and not having any problems," and Dr. Haskin noted that Chubb's conversation was good and that he is "making good progress and has no complaints." Nonetheless, Dr. Haskin assessed a GAF score of only 40 (Tr. 515). In January 2011, Chubb was anxious and upset about stolen medications (Tr. 519) and had a depressed mood and tearfulness (Tr. 560, 562). Dr. Haskin lowered Chubb's GAF score to 39. He also noted some discrepancies between Chubb's statements and information from the pharmacy regarding how much medication he had obtained (Tr. 519–20).

In February 2011, Dr. Haskin completed a Psychiatric/Psychological Impairment Questionnaire in which he diagnosed Chubb with PTSD and major depressive disorder, recurrent, severe without psychotic features (Tr. 494). Clinical findings included poor memory, sleep disturbance, mood disturbance, emotional liability, recurrent panic attacks, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, oddities of thought, perception, speech, or behavior, social withdrawal or isolation, blunt, flat, or inappropriate affect, decreased energy, and persistent irrational fears (Tr. 495).

Dr. Haskin opined that Chubb was markedly limited in the following areas: his ability to understand, remember, and carry out detailed instructions; his ability to maintain attention and concentration for extended periods; his ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Tr. 497–98). Chubb was also moderately limited in all other areas of understanding and memory, sustained concentration and persistence, social interactions, and adaptation (Tr. 497–99).

Dr. Haskin reported that Chubb experienced episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from that situation or experience an exacerbation of signs and symptoms due to anxiety with worsening ability to think and function (Tr. 499). He noted that Chubb is not a malingerer (Tr. 500). He opined that Chubb was incapable of handling even low stress work evidenced by his difficulty even coming to his appointments at the psychiatrist's office. *Id.* Chubb experienced good days and bad days, and Dr. Haskin estimated that Chubb would be absent from work, on the average, more than three times a month as a result of his impairments or treatment (Tr. 501). Dr. Haskin also indicated that Chubb's impairments were ongoing and expected to last at least twelve months (Tr. 500).

From February to June 2011, Chubb was seen at Oaklawn nearly weekly for therapy visits (Tr. 532–58). During this period, Chubb seemingly had many changes in his moods. Dr. Haskin's observations ranged from "fairly stable" but "dysthymic" (serious chronic depression) (R. 534), to recognizing that his depressed mood is just circumstantial (Tr. 538). Chubb's therapists noted various swings from "more cheerful and positive mood" (Tr. 542), to stable but

sad mood (Tr. 544), to "depressed mood" (Tr. 546), to "hopeless" (Tr. 558). Dr. Haskin assessed GAF scores of 40 and 45 in February and May, respectively.

5.    *Memorial Hospital of South Bend*

In November, Chubb was seen twice in the emergency room for syncopal episodes. He was diagnosed with a "syncopal episode" (fainting) and depression (Tr. 426, 473). Chubb was also treated in the emergency room for another syncopal episode in February 2011 (Tr. 464).

6.    *Patrick Utz, Ph.D. – SSA Consultative Psychologist*

Dr. Utz evaluated Chubb at the request of the Social Security Administration in August 2010 (Tr. 380). He noted that Chubb had been a patient at the Madison Center, but there is no indication that Dr. Utz was provided with any of the treatment records (Tr. 381).  Chubb complained of PTSD with symptoms of disturbed sleep and appetite. *Id.*   A mental status examination was notable for an inability to interpret proverbs, decreased remote memory, an inability to complete serial 7s or count down by 3s from 30, a depressed and anxious mood and affect, thoughts that a woman is out to get him, a very poor appetite, somewhat obsessive in his mental trends, and fears of leaving his home (Tr. 381–83).  Dr. Utz diagnosed some PTSD patterns, depressive disorder, and histrionic personality patterns—these made it difficult for Dr. Utz to sort out reality from his perception and dramatization of reality (Tr. 383). Dr. Utz assessed a GAF score of 55, denoting moderate symptoms (Tr. 384).

7.    *Eric Swensen, D.O. – SSA Consultative Examiner*

Dr. Swensen also evaluated Chubb at the request of the Administration in August 2010 (Tr. 388). Chubb reported a medical history of PTSD, hypertension, cardiovascular disease, fatigue, and loss of concentration and focus. *Id.*   He reported having flashbacks of being raped while in jail and was very tearful during his evaluation (Tr. 389).  A physical examination was

normal (Tr. 390–91). Dr. Swensen diagnosed depression, PTSD, and hypertension (Tr. 391). The doctor stated that if Chubb's allegations were true, it appeared that he was "severely limited" due to his PTSD. *Id.*

8.      *State Agency Psychological Consultants*

The record contains opinions from two State agency psychological consultants, Joseph A. Pressner, Ph.D., and Doma Unversaw, Ph.D., which are based on their reviews of Chubb's medical files at the time of the opinion. Dr. Pressner completed his review on October 10, 2010, a few days before Chubb began seeing Dr. Haskin. Dr. Pressner opined that Chubb was suffering from "Depressive Disorder NOS" and PTSD, and assessed him with moderate limitations on activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace (Tr. 417).

Dr. Pressner completed a second, more detailed, mental residual functional capacity assessment on November 19, 2010, after Dr. Pina and Nurse Robinson of the Madison Center had opined that Chubb was markedly limited in virtually all areas (Tr. 443). This time, he opined that Chubb was moderately limited in his abilities to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, ask simple questions or request assistance, and accept instructions and respond appropriately to criticism from supervisors; he opined that Chubb was markedly limited only in his ability to interact appropriately with the general public (Tr. 444). Dr. Pressner also discussed the treating source opinion from the Madison Center: he believed that the opinion of marked limitations across the board was inconsistent with the reports of functioning and objective medical status and gave no weight to the opinion (Tr. 445). He opined that Chubb relates adequately to other people and would only have difficulty working with a

supervisor who was often negative, critical, or quarrelsome, and that he would have problems with complex tasks but would be able to complete repetitive tasks on a sustained basis without special consideration. *Id.*

Dr. Unversaw's December 22, 2010 opinion is considerably briefer (Tr. 457). It notes simply that "I have reviewed all the evidence in file and [Dr. Pressner's] assessment of 11/19/2010 is affirmed, as written."

## B. Relevant Portion of Chubb's Testimony

Chubb testified that he was let go from his last job because he was told he was making a lot of mistakes (Tr. 51-52). He stated that he cannot work as a result of his depression, post-traumatic stress disorder, and anxiety (Tr. 60). He only sleeps about two hours a night because he sleeps during the day (Tr. 63). Chubb rarely leaves his room or goes out because he is scared of being out in public (Tr. 75). He is afraid of other people because he does not know if he can trust others (Tr. 77). He also reported having no desire to live (Tr. 75). Chubb has difficulties with attention and concentration, as well as problems with memory (Tr. 78). He described having negative thinking all the time. *Id.* He described having episodes of flashbacks when he would stare off into space for 5 to 10 minutes at a time, which occurred 5 to 10 times a day (Tr. 79). He described approximately six episodes of passing out when he was stressed (Tr. 76).

Chubb lives with his mother part time and with a friend at other times (Tr. 46). He leaves his mother's house often because there are other people there frequently and he does not like to be around them. *Id.* In an average day, Chubb gets up around 6:00 and takes care of his dogs and then goes back to bed (Tr. 49). When he gets up later, he will put his dogs in their pen for a couple of hours and then spend the rest of his day sitting in his room. *Id.* He stated that he is able to make his bed, take out the trash, and dress himself (Tr. 50). Chubb does not have any

hobbies and does not do any yard work, vacuuming, sweeping, or cooking. *Id.* He will "try" to

wash the dishes, but his mother rewashes them afterwards (Tr. 51). He does not do any shopping

because he cannot be around other people. *Id.*. Chubb collected unemployment for

approximately one year after he stopped working. (Tr. 60-61).

### C. Relevant Portion of Vocational Expert's Testimony

The VE testified that an individual of Chubb's age, education, and work history who was

limited to simple, routine, and repetitive tasks, performed in a work environment free of fast-

paced production requirements, routine work changes, only superficial contact with the public,

and only occasional interaction with co-workers, could not perform any of Chubb's past work

(Tr. 84–85). However, he could perform other work as a janitor, dishwasher, kitchen helper,

mail clerk, housekeeper, and hand packer (Tr. 86). If he had an additional limitation that

required him to be off task for 5 to 10 minute periods due to anxiety and intrusive thoughts

during the day, in addition to regular breaks, he could not perform any work (Tr. 88–89).

The VE also considered a hypothetical individual who had moderate limitations in the

abilities to perform activities within a schedule, maintain regular attendance, be punctual within

customary tolerance, be aware of normal hazards, to travel to unfamiliar places or use public

transportation, and to set realistic goals or make plans independently, and marked limitations in

the ability to complete a normal workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods. He opined that such an individual could not perform any work (Tr. 87–88).

### D. ALJ's Decision

The ALJ found that Chubb met the insured status requirements of the Social Security Act

through December 31, 2013 (Tr. 20). In addition, the ALJ found that Chubb had not engaged in

substantial gainful activity since the onset of his alleged disability. *Id.* The ALJ concluded that

Chubb had the severe impairments of depression and posttraumatic stress disorder. *Id.* She also

noted moderate limitations on concentration, persistence and pace, as well as moderate

restriction in activities of daily living and maintaining social functioning (Tr. 22).  Despite these

impairments, the ALJ concluded that Chubb did not have an impairment or combination of

impairments that met or medically equaled any of those included in the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1. *Id.* The ALJ found that Chubb's allegations concerning

the intensity, persistence and limiting effects of his symptoms were not fully credible (Tr. 24).

Moreover, the ALJ concluded that Chubb has the capacity to perform a full range of work at all

exertional levels but is limited to simple, routine and repetitive tasks performed in a work

environment free of fast-paced production requirements, involving only simple work related

decisions and routine work places changes. Additionally, the ALJ limited Chubb to superficial

contact with the public and only occasional interaction with coworkers (Tr. 23). Given this RFC,

the ALJ subsequently concluded that Chubb could not perform any of his past relevant work, but

he could perform jobs that existed in significant numbers in the national economy; therefore, he

was not disabled (Tr. 27–28).

### III. STANDARD OF REVIEW

The ALJ's ruling becomes the final decision of the Commissioner when the Appeals

Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009).  On  review, the

district court will affirm the Commissioner's finding of fact and denial of disability benefits if

they are supported by substantial evidence.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  This

evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision, as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id.*

The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### IV. DISCUSSION

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to

be used in determining whether the claimant has established a disability.  20 C.F.R. §

404.1520(a)(4)(i)-(v).  The steps are used in the following order:

> 1. Whether the claimant is currently engaged in substantial gainful activity;
> 2. Whether the claimant has a medically severe impairment;
> 3. Whether the claimant's impairment meets or equals one listed in the regulations;
> 4. Whether the claimant can still perform past relevant work; and
> 5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  If the claimant is performing

substantial gainful activity (step one) the claimant will be found not disabled. 20 C.F.R. §

404.1520(a)(4)(i). If the claimant does not have a severe medically determinable impairment or a

combination of impairments that is severe and meets the duration requirement (step two), the

claimant will likewise be found not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is

not performing substantial gainful activity and does have a medically severe impairment,

however, the process proceeds to step three. At step three, if the ALJ determines that the

claimant's impairment or combination of impairments meets or equals an impairment listed in

the regulations, disability is acknowledged by the Commissioner.  *See id.* § 404.1520(a)(4)(iii).

However, if a listing is not met, in between steps three and four, the ALJ must then assess the

claimant's RFC, which, in turn, is used to determine whether the claimant can perform his past

work under step four and whether the claimant can perform work in society at step five.  20

C.F.R. § 404.1520(e).  The claimant has the initial burden of proof in steps one through four,

while the burden shifts to the Commissioner in step five to show that there are a significant

number of jobs in the national economy that the claimant is capable of performing.  *Young v.

Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Two of Chubb's arguments are directed at the ALJ's RFC determination while one of his

arguments concerns step five. The ALJ found that Chubb has the RFC to perform a "full range of

work at all exertional levels but is limited to simple, routine and repetitive tasks performed in a work environment free of faced-paced (*sic*) production requirements, involving only simple work related decisions and routine work place changes." (Tr. 23). Additionally, the ALJ found that Chubb is limited to superficial contact with the public and only occasional interaction with coworkers. *Id.* Chubb believes that the ALJ erred in three ways: 1) the ALJ failed to give proper weight to medical sources; 2) She improperly decided that certain of his statements about his symptoms were not credible; and 3) the ALJ relied upon flawed vocational expert testimony.

## A. The ALJ's Reasons For Declining to Give Controlling Weight To The Treating Physicians Are Insufficient

Disability cases typically involve three types of physicians: 1) a treating physician who regularly provides care to the claimant; 2) an examining physician who conducts a one-time physical exam of the claimant; and 3) a reviewing or non-examining physician who has never examined the claimant, but read the claimant's files to provide guidance as an adjudicator. *See Giles v. Astrue*, 433 Fed. App'x. 241, 236 (5th Cir. 2011). The opinion of the first type, a "treating physician," is generally afforded special deference in disability proceedings. The regulations governing social security proceedings instruct claimants to that effect:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R § 404.1527(c)(2).

However, while a treating physician's opinion is important, it is not the final word on a claimant's disability. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ, thus, may discount a treating physician's medical opinion if it is internally inconsistent or inconsistent with other evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). An ALJ may also discount a treating physician's opinion if it reveals bias due to sympathy for the patient. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Ultimately, an ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates her reasons for doing so. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). The Seventh Circuit has deemed this very deferential standard to be "lax." *Id.* Nevertheless, the ALJ must offer "good reasons" for discounting a treating physician's opinion. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

The ALJ determined that Dr. Haskin's opinion was not entitled to controlling weight and was given "little weight." The ALJ gave the following reasons for her decision: 1) that Dr. Haskin's impairment questionnaire is not based upon the objective medical evidence; 2) that Dr. Haskin's recommended treatment has been conservative; and 3) that Dr. Haskin's opinion was inconsistent with Dr. Reinstein's progress notes and with Dr. Utz's assessment of Chubb's GAF score.[5]

When examined closely, however, none of these reasons are supported by the evidence in the record and appear to "cherry-pick" certain unfavorable evidence while ignoring evidence supporting Dr. Haskin's opinion, including Dr. Pina and Nurse Robinson's opinions. First, with regard to objective medical evidence, Dr. Haskin reported the following clinical findings: poor memory; mood disturbance; emotional liability; recurrent panic attack; paranoia; oddities of thought, perception, speech or behavior; social withdrawal of isolations; decreased energy; and

---

[5] The ALJ and the Index of Exhibits incorrectly refers to Dr. Haskin as Dr. Hasin.

persistent irrational fears. As Chubb notes, the regulations identify such observable psychiatric abnormalities as acceptable clinical and diagnostic techniques. *See* 20 C.F.R. § 404.1528 and § 416.928. The ALJ does not explain why she believed that these clinical observations could not support controlling weight.

In addition, the Court notes that Dr. Haskin's treatment notes over an eight month period appear consistent with his opinion of Chubb's limitations—he consistently diagnosed PTSD, panic disorder with agoraphobia, and severe depression, and assessed GAF scores of 40, 43, 39, 40, and 45 over that period.[6] It is true that "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010) (*quoting Wilkins v. Barnhart*, 69 Fed.Appx. 775, 780 (7th Cir.2003)). However, Dr. Haskin's consistent evaluation of Chubb's GAF in his treatment notes undermines the ALJ's assertion that Dr. Haskin's progress notes do not support his opinion of major limitations in areas such as work, family relations, judgment, thinking, or mood.

Dr. Haskin's observations in his evaluation and treatment notes are also entirely consistent with Chubb's prior treatment at the Madison Center by Dr. Pina and Nurse Robinson, where he was also diagnosed with PTSD, severe anxiety, and severe depression and assessed with a GAF score range of 35–40. Their November 2010 report, submitted at the ALJ's request, provided significant further details in support of both Nurse Robinson's original evaluation and Dr. Haskin's later assessment, explaining how Chubb's flash-backs, severe social anxiety and

---

[6]These GAF scores are indicative of the following symptoms per the DSM-IV-TR:
41 - 50 Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work);
31 - 40 Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

PTSD, which stem from his rape, markedly limited his ability to perform simple work related tasks, interact with other people, and respond appropriately to changes in the work setting, among other things. And while the ALJ similarly afforded Dr. Pina's opinion[7] and Nurse Robinson's opinion[8] little weight (Tr. 27), she did so without adequate explanation of the medical records. *See* 20 C.F.R. § 404.1527; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (noting that the factors the ALJ should consider when determining the weight to give the treating physician's opinion include the length of treatment and frequency of examination, whether the physician supported his opinion with sufficient explanations, the extent to which the treating physician presents relevant evidence to support his opinion, whether the physician specializes in the medical conditions at issue, and the consistency of the opinion). In short, the ALJ simply cherry-picked a few progress notes and other records unfavorable to a finding of disability, and then completely ignored extensive medical evidence from treating sources supporting Chubb's significant limitations. Without sufficient discussion by the ALJ of the various medical records from treating sources, which potentially support a finding of disability, the ALJ failed to provide a "logical bridge" between the evidence and her conclusions.

---

[7]The Court specifically notes that the ALJ gave little weight to Dr. Pina's opinion that Chubb was markedly limited in all aspects of mental functioning, including understanding and memory, sustained concentration and persistence, social interactions and adaptations (Tr. 440–42). The ALJ noted that the opinion was inconsistent with Dr. Reinstein's progress notes, but as noted below the ALJ's high view of Dr. Reinstein's notes and his opinion is questionable at best. The ALJ also considered Dr. Pina's opinion inconsistent with treatment records from the Madison Center, but this is questionable as well. First, the only Madison Center records other than Dr. Pina's and Nurse Robinson's reports and assessments is the social worker's May 2010 assessment; the Court notes the oddity of elevating this assessment over Dr. Pina's opinion. But, in any event, the ALJ did not explain how Dr. Pina's opinion was inconsistent with the other notes from the Madison center. Even though Mr. Snell, LCSW found that Chubb was within normal limits for productivity, continuity, orientation, memory and attention/concentration (Tr. 344), Mr. Snell gave Chubb a GAF score of 45 (Tr. 340). Without overemphasizing the importance of the GAF score, the Court notes that under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, a GAF score of 41–50 is indicative of "serious symptoms . . . or *serious impairment* in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (emphasis added). Such a GAF score is not inconsistent with a finding that Chubb is markedly limited in every aspect of mental functioning.

[8]Although Ms. Robinson is not considered an "acceptable medical source," under 20 C.F.R. § 404.1513(a), she may provide insight into the severity of Chubb's impairments and how they affect his ability to function. Therefore the ALJ is required to consider the opinion and explain the basis for the weight afforded the opinion. *Id.*

Second, in discounting Dr. Haskin's opinions in light of his "conservative" treatment recommendations, the ALJ falls into a trap noted by other courts. Although conservative treatment may reflect on the claimed severity of subjectively reported symptoms of physical ailments, "[w]here mental activity is involved, administering medications that can alter behavior shows anything but conservative treatment." *Baker v. Astrue*, No. ED CV 09-01078 RZ, 2010 WL 682263 *1 (C.D. Cal, Feb 24, 2010). Both Dr. Reinstein and Dr. Haskin prescribed a number of depression medications to Chubb. Dr. Haskin also demonstrated that the treatment was less than conservative by increasing the dosage of medication throughout the treatment (Tr. 510).

Third, with regard to inconsistencies between Dr. Haskin's opinion and the opinions of treating psychiatrist Dr. Reinstein and consultative psychologist Dr. Utz, the ALJ overstated her case. First, the Court notes that Dr. Reinstein's notes have little value as they are both generally illegible and sparse. Second, although Dr. Reinstein did observe in an October 2009 note that Chubb's mood was "bright" and that Chubb "appears stable," (Tr. 333), the ALJ's reliance on this single treatment note demonstrates a "fundamental, but regrettably all-too-common, misunderstanding of mental illness," repeatedly decried by the Seventh Circuit. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *see, e.g., Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir.2010); *Parker v. Astrue,* 597 F.3d 920, 924–25 (7th Cir.2010); *Pate–Fires v. Astrue,* 564 F.3d 935, 944–45 (8th Cir.2009); *Wilder v. Chater,* 64 F.3d 335, 336–37 (7th Cir.1995). That is, a "person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition." *Punzio v. Astrue*, 630 F.3d at 710. In spite of Dr. Reinstein's positive notes in October 2009, three months later Dr. Reinstein noted

that Chubb was depressed, (Tr. 332), and in April 2011 the doctor recorded that Chubb's appearance was "crying and anxiety" (Tr. 330).

Finally, Dr. Utz's assessment of a GAF score of 55 on the single occasion on which he examined Chubb is not, standing alone, a "good reason" to reject Dr. Haskin's treating opinion, nor the opinions of Dr. Pina and Nurse Robinson. For one, Dr. Utz's assessment only reflects his observations of Chubb on the day of the examination, which may reflect one of his better days—the record is replete with evidence that Chubb's mental state fluctuated widely over time. Moreover, the ALJ's emphasis on Dr. Utz's GAF score—the lone such score above 45—is internally inconsistent with her own failure to discuss, much less consider, most of the GAF score assessments in the record.

Given the fact that the logical bridge is missing with respect to a discussion of the relevant medical records revealing Chubb's limitations, there is not a valid determination in this case of Chubb's RFC. And without a proper RFC evaluation, steps four and five cannot be properly analyzed. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the ALJ must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p. In other words, the Court has no way of concluding whether the hypothetical questions posed to the VE ultimately included all of Chubb's limitations because there was an insufficient discussion of the record evidence supporting the ALJ's RFC determination. Moreover, to the extent some of the more restrictive hypos may have included all of the limitations from which Chubb suffers, the VE responded that Chubb would not be able to sustain competitive employment. In essence, given the unsupported RFC determination, it is impossible for the Court to determine whether the questions posed to the VE are adequate and inclusive of all the conditions Chubb alleges he

suffers from, and whether the VE's testimony sufficiently establishes whether Chubb could in fact perform his past work or other work.

For these reasons, the ALJ has not adequately explained her decision to refuse controlling weight to treating source opinions, which would have supported a more restrictive RFC. While it appears likely, based on the evidence discussed above, that the treating source opinions are indeed entitled to controlling weight, the Court is not in a position to make that determination, let alone decide what additional limitations ought to be included in the RFC assessment and hypos posed to the VE. The Court will therefore remand this case for further consideration in light of the above observations.

## B. Other Issues to be Considered on Remand

The Court need not determine whether the other issues raised by Chubb would dictate a remand, alone or in combination. However, for the sake of completeness and to help ensure that the Commissioner's decision on remand is free from unnecessary errors, the Court notes that the following issues should also be addressed on remand.

First, if Dr. Haskin and the other treating source opinions are not given controlling weight, it is still necessary for the ALJ to determine what weight to give that testimony and to adequately explain her reasons in light of the factors in 20 C.F.R. § 404.1526(d), including the nature and length of the treating relationship. As previously indicated, the ALJ did not do that here. "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir.1981). In such a situation, "to say that [the ALJ's] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." *Cowart*, 662 F.2d at 735 (quoting *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir.1979)) (internal quotation marks omitted).

Second, though it is not necessary to determine whether the ALJ's credibility finding was ultimately appropriate, the Court notes that it was not without flaws. Significantly, the Seventh Circuit has recently severely criticized the boiler-plate language that the ALJ used in making her credibility determination in this case. *See Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012). To merely state that Chubb's statements aren't credible "to the extent they are inconsistent with the above residual functional capacity assessment" is insufficient—especially where the analysis of the medical evidence is lacking and the resulting RFC determination is incomplete.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Chubb's request for a remand of the ALJ's decision [DE 1]. Accordingly, the Court now **REMANDS** this case for further consideration by the Commissioner, consistent with the conclusions in this Opinion and Order.

SO ORDERED.

ENTERED:   August 27, 2013

                    /s/ JON E. DEGUILIO
                    Judge
                    United States District Court